UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **JAMIE HOPE SIDERIS,** ) | CASE NO. 1:19-CV-01594 |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| ) | |
| **ANDREW SAUL,** ) | |
| *Comm'r of Soc. Sec.*, ) | MEMORANDUM OPINION AND |
| ) | ORDER |
| Defendant. ) | |

Plaintiff, Jamie Hope Sideris (Plaintiff), challenges the final decision of Defendant Andrew Saul, Commissioner of Social Security (Commissioner), denying her application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, et seq. (Act). This court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to consent of the parties. (R. 9). For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

**I. Procedural History**

On December 21, 2016, Plaintiff filed an application for DIB, alleging a disability onset date of December 17, 2016. (R. 8, Transcript (Tr.) 160). The application was denied initially on February 15, 2017, (Tr. 76), and upon reconsideration on April 28, 2017 (Tr. 91). On May 9, 2017, Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (Tr. 98-107). Plaintiff participated in the hearing on May 31, 2018, was represented by counsel, and testified. (Tr. 30-61). A vocational expert (VE) also participated and testified. (*Id.*).

On August 21, 2018, the ALJ denied Plaintiff's application, concluding that Plaintiff was not disabled within the meaning of the Act. (Tr. 9-29). On May 30, 2019, the Appeals Council denied Plaintiff's request to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 1-6).

On July 12, 2019, Plaintiff filed a complaint challenging the Commissioner's final decision. (R. 1). The parties have completed briefing in this case. (R. 11 & 12). Plaintiff asserts the following assignment of error: "the ALJ erred by failing to analyze the treating opinion evidence regarding Plaintiff's physical impairments consistent with the regulations, Agency policy, and Sixth Circuit precedent." (R. 11).

## II. Evidence

### A. Relevant Medical Evidence[1]

#### 1. Treatment Records

On May 5, 2016, Rajesh Sharma, M.D. evaluated Plaintiff for complaints of low back pain with associated stiffness. (Tr. 18, 238). Plaintiff exhibited pain over the third and fourth lumbar spinous process, but her deep tendon reflexes were intact and straight leg raises were negative bilaterally. (Tr. 18, 239). Dr. Sharma prescribed Zanaflex for Plaintiff's low back pain. (Tr. 18, 239).

On June 7, 2016, Kelsey McCracken, CNP, evaluated Plaintiff for back pain. (Tr. 18, 276-79). Clinical findings included decreased lumbar range of motion secondary to pain, tenderness to palpation over the lower lumbar spine, and decreased sensation in her lower left extremity. (Tr.

---

[1] The recitation of the evidence is not intended to be exhaustive. It includes only those portions of the record cited by the parties in their briefs and deemed relevant by the court to the assignments of error raised.

18, 277). Plaintiff's gait was normal, and she was able to toe, heel, and tandem walk normally. (Tr. 18, 277). Plaintiff's reflexes were normal, straight leg raises were negative bilaterally, and she had full strength in her bilateral lower extremities. (Tr. 18, 277-78). CNP McCracken assessed Plaintiff with low back pain without sciatica, spondylosis of the lumbar region, and sacralization of the lumbar vertebra; and she prescribed Plaintiff Mobic along with physical therapy. (Tr. 18, 278-79). Plaintiff started physical therapy and underwent bilateral L4-L5 and L5-S1 medial branch and dorsal rami blockades. (Tr. 18). Plaintiff followed up with CNP McCracken on December 20, 2016, and reported that she had no relief. (Tr. 18, 243). On January 25, 2017, Plaintiff underwent rheumatology testing to include antinuclear antibodies and rheumatoid factor testing, which was negative. (Tr. 18, 349).

Plaintiff presented for an evaluation with Bassam Alhaddad, MD with complaints of neck, back, and left wrist pain. (Tr. 19, 340-45). Dr. Alhaddad's clinical findings included bilateral sacral joint tenderness, limited lumbar forward flexion, and left wrist tenderness. Dr. Alhaddad noted that Plaintiff had full cervical range of motion, no synovitis in her hands/fingers, normal motor strength and sensation in her upper and lower extremities. (Tr. 19, 340-45). Dr. Alhaddad assessed Plaintiff with sacroiliitis, lumbar spondylosis without myelopathy, transient synovitis of the left wrist, cervicalgia, and fibromyalgia; the doctor prescribed gabapentin and prednisone. (Tr. 19, 342-45). On February 16, 2017, Dr. Alhaddad informed Plaintiff that a recent MRI of the sacroiliac joint was negative. (Tr. 19, 340-341, 481-82).

On March 28, 2017, Tyecia Stevens, CNP conducted a physical medicine and rehabilitation evaluation of Plaintiff's back pain. (Tr. 19, 481). Plaintiff exhibited decreased lumbar range of motion as well as tenderness to the bilateral thoracolumbar and lumbosacral paraspinal muscles bilaterally. (Tr. 19, 483-84). On examination, straight leg raises were negative, Plaintiff's motor

3

strength and sensation were normal in her lower extremities, and she could heel, toe, and tandem walk with no difficulty. (Tr. 19, 483-84).

On April 20, 2017, after a positive Doppler signal at the carpal bone level, Dr. Alhaddad assessed Plaintiff with seronegative rheumatoid arthritis of the left wrist and prescribed her methotrexate and folic acid. (Tr. 19, 500-01). There were no suggestions of inflammatory arthritis. (Tr. 19, 497).

On June 20, 2017, Plaintiff underwent a mental health assessment with Siobhan Malave, LISW, who assessed Plaintiff with major depressive disorder, moderate, recurrent, generalized anxiety disorder, and post-traumatic stress disorder. (Tr. 20, 548-54).

Plaintiff followed up with Dr. Alhaddad on July 20, 2017, and reported no improvement in her level of pain. (Tr. 20, 498). The doctor advised Plaintiff to consider aquatic therapy and water exercises, discontinue methotrexate and folic acid, and follow-up in three months. (*Id*.)

On June 27, 2017, Debra Bowes, APRN, CNP evaluated Plaintiff for increased depression and anxiety. (Tr. 19, 505). Ms. Bowes assessed Plaintiff with anxiety with depression as well as an anxiety attack. (*Id*.)

Plaintiff's medical records indicate that between July 25, 2017, and March 29, 2018, the signs and symptoms associated with her impairments remained stable. (Tr. 21).

On a March 29, 2018, Plaintiff went to the emergency department for right-side flank pain, and upon examination the doctor assessed no musculoskeletal or neurological abnormalities. (Tr. 21, 617).

On April 10, 2018, Devon Conway, M.D. conducted a neurological evaluation. (Tr. 21, 674-79). Plaintiff was alert; fully oriented; and her concentration, memory, intellectual functioning and affect were normal. (Tr. 21, 677-78). She had full motor strength in her upper and lower

4

extremities, her reflexes were intact, and she showed no coordination or sensory deficits. (Tr. 21, 677-78). Plaintiff's gait was normal; and although she displayed some heel walking problems, she was able to walk on her toes and with a tandem gait. (Tr. 21, 678). A follow-up brain MRI from April 24, 2018, was unremarkable. (Tr. 21, 686).

### 2. Medical Opinions Concerning Plaintiff's Functional Limitations

On January 30, 2017, Plaintiff underwent a psychological consultative exam with Mitchell Wax, PhD. (Tr. 18, 330). Ohioans with Disabilities referred Plaintiff to Dr. Wax for a psychological evaluation related to her claim for mental disability benefits. (Tr. 330). Dr. Wax noted the following in his summary of the exam: Plaintiff stated that she is often depressed and anxious, and lacks friendships; she is being seen by a doctor for her medical problems, and being assessed for possible lupus; she has a history of depression and hospitalization for self-harm ideation, but she has no current mental health treating source; she is not currently taking any mental health medication; she is isolating herself; her demeanor deteriorated throughout the exam and she appeared sad, depressed, anxious, and far away. (Tr. 334).

Dr. Wax assessed Plaintiff with major depression and generalized anxiety disorder. (Tr. 19, 334). Dr. Wax provided the following functional assessment: Plaintiff could understand, remember, and follow instructions but would have difficulty maintaining attention and concentration secondary to her depression and chronic pain; she would not respond appropriately to supervisors, coworkers, or work pressures in a work setting due to her depression and anxiety. (Tr. 18, 335).

On February 28, 2018, Siobhan Malave, LISW completed a mental impairment questionnaire. (Tr. 20, 579). Ms. Malave noted that Plaintiff could be expected to miss eight to ten days per month due to her impairments and/or related treatment, and that she could be expected to

5

be off task approximately 50 percent of the day. (Tr. 21, 579).

On April 12, 2018, Plaintiff presented for a functional capacity evaluation with Tyecia Stevens, APRN, CNP at the request of Dr. Sharma. (Tr. 21, 582-86). Ms. Stevens' note states "Patient states PCP has form and will complete." (Tr. 21, 582). The provider's note indicates Plaintiff is able to lift up to ten pounds, and Plaintiff reported she could sit and stand for thirty minutes each, and also self-reported that she could walk ten to fifteen minutes. (Tr. 585). Ms. Stevens' impression was Plaintiff "presents to the clinic for a disability examination. C/o multiple sites pain. Has multiple tender points and limited ROM. Has chronic pain syndrome however imaging on file is unremarkable." (Tr. 586). On May 9, 2018, Dr. Sharma completed a treating source statement that indicated Plaintiff was diagnosed with lumbosacral spondylosis for which her symptoms included back pain, wrist pain, neck pain, shoulder pain, and radiating pain down both legs. (Tr. 21, 590). He stated that she could sit/stand no more than 30 minutes each at one time for less than two hours in a workday; she could never lift as little as ten pounds, and her symptoms were sufficiently severe that she would likely be off task for approximately 25 percent of the workday. (Tr. 21, 591-93). He noted that she was incapable of even low stress work because stress would worsen her level of pain. (Tr. 21, 593).

### B. Relevant Hearing Testimony

During the hearing on May 31, 2018, Plaintiff testified that the only chore she managed in her household was loading the dishwasher once a week. (Tr. 37). She could bathe, dress, and feed herself, although she does not cook. (Tr. 38). Plaintiff explained that her husband did the rest of the housework. (*Id.*) She stated that she purchased a cart to help her with grocery shopping, and that without her cart, she could only get through two aisles in the store without being in too much pain. (Tr. 39). She testified that she could drive if she did not take her medication. (*Id.*) She talked

to her mother regularly but reported no friends. (*Id.*) She testified that she used to have a lot of friends but closed herself off through the years. (Tr. 54). She stated that she did not belong to any clubs or organizations and had no hobbies. (*Id.*)

Plaintiff testified that the last time she worked was in December of 2016, as a pet groomer at Petco. (Tr. 42). When she first started at Petco, she worked full time, but she quickly reduced her hours to 25, and ultimately quit. (Tr. 43). She reduced her hours because she was in pain and could not completely perform her job. (Tr. 51). The heaviest she lifted was 40 pounds. (Tr. 44). Before working at Petco, Plaintiff was self-employed as a dog groomer. (Tr. 44).

Plaintiff testified that she worked at Home Depot from 2006 to 2010. (Tr. 45). She stacked shelves and moved products, the heaviest approximately 50 pounds. (Tr. 45-6). Plaintiff confirmed that she was on her feet the entire shift. (Tr. 46).

As to her medical history, Plaintiff testified that it was hard to decide whether the "pain of the fibromyalgia or the anxiety" was her "number one problem." (Tr. 47). She explained that anxiety made it hard for her to leave the house (Tr. 47), and she treated her anxiety with medication and counseling. (Tr. 48). Plaintiff planned to continue counseling. (Tr. 48). Plaintiff stated that she was diagnosed with fibromyalgia approximately one year ago and that she was treating with various medications. (Tr. 48-49). She testified that the pain was most frequently in her back and the medications only helped some of the time. (Tr. 49). She has had injections, physical therapy, massages, and lidocaine patches. (Tr. 49-50). Physical therapy made the pain worse. (Tr. 50). Plaintiff stated that she did not exercise. (Tr. 50).

Plaintiff explained that she has fallen a few times and has been to the emergency room. (Tr. 54). She stated that "[w]henever I get up in the morning, my whole body's like pretty stiff and hurts really bad to move." (Tr. 54). "Sometimes whenever I get…moving around…it loosens up

7

and it's not so bad[,]" and she testified that other days she would spend the day in bed. (Tr. 54). She estimated that she spent five days a month in bed. (Tr. 55).

During the administrative hearing, the ALJ heard testimony from the VE. (Tr. 55). The ALJ posed the following hypothetical question to the vocational expert:

> I would like you to consider a person with the same age, education and past work as the claimant who is able to occasionally lift and carry 20 pounds; and frequently lift and carry 10 pounds; is able to stand and walk six hours of an eight-hour workday; is able to sit for six hours of an eight-hour workday; would have unlimited push and pull other than shown for lift and/or carry; could occasionally climb ramps and stairs and never climb ladders, ropes or scaffolds; and could occasionally stoop, kneel, crouch and crawl; and this individual must avoid all hazards, by that I mean unprotected heights and hazardous machinery; in addition, this hypothetical individual can perform frequent handling and fingering with the left upper extremity; and this hypothetical individual can perform simple, routine tasks consistent with unskilled work with no fast pace or high production quotas and with infrequent change; and with superficial interaction with others, and by superficial, I mean of short duration for a specific purpose; give such a hypothetical individual, first off, would this hypothetical individual be able to perform the claimant's past work as those occupations are either general and/or actually performed?

(Tr. 57).

The VE testified that such an individual could not perform Plaintiff's past work. (Tr. 57). The VE identified the following jobs that could be performed given the hypothetical limitations: price marker, cashier II, order caller, with 90,000, 120,000, and 150,000 jobs respectively, according to national labor statistics, and further testified "these are example jobs, so there would be others as well." (Tr. 58). The ALJ asked the VE to "assume that this hypothetical individual can perform what I call low stress work, and by that I mean no arbitration, negotiation, responsibility for the safety of others and/or supervisory responsibility[.]" (Tr. 58). The VE confirmed that that hypothetical individual could perform the jobs previously identified. (Tr. 58).

The ALJ asked the VE to "further assume that this hypothetical individual would be absent from work two or more times per month due to a combination of either mental health symptoms

and/or chronic pain[.]" (*Id.*). The VE testified that two or more absences per month on an ongoing basis was not conducive to competitive work, so there was no employment under that hypothetical. (*Id.*).

Finally, the ALJ asked the VE to remove the absences from the hypothetical and "assume that this individual might be off task approximately 20% of the time, again, due to a combination of mental health symptoms and/or chronic pain[.]" (Tr. 59). The VE stated that 20% off-task time was beyond acceptable off-task tolerance; and, therefore, there was no work under that hypothetical condition. (Tr. 59).

**III. Disability Standard**

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 404.1505 & 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); 404.1509 and 416.909(a).

The Commissioner determines whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that she suffers from a medically determinable "severe impairment" or combination of impairments in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c)

9

and 416.920(c). A "severe impairment" is one that "significantly limits ... physical or mental ability to do basic work activities." *Abbott*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment (or combination of impairments) that is expected to last for at least twelve months, and the impairment(s) meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment(s) does not prevent her from doing past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment(s) does prevent her from doing past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g) and 416.920(g), 404.1560(c).

## IV. Summary of the ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.

2. The claimant has not engaged in substantial gainful activity since December 17, 2016, the alleged onset date (20 CFR 404.1571).

3. The claimant has the following severe impairments: degenerative disc disease, fibromyalgia, coronary artery disease, seronegative rheumatoid arthritis, depressive disorder, anxiety disorder, and post-traumatic stress disorder (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except [claimant] is able to occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds, is able to stand and walk 6 hours of an 8-hour workday, is able to sit for 6 hours of an 8-hour workday, unlimited ability to push and pull other than that shown for lift and/or carry, occasionally

climb ramps and stairs, never climb ladders, ropes and scaffolds, occasionally stoop, kneel, crouch and crawl; avoid all hazards – unprotected heights and hazardous machinery; frequent handling and fingering with the left upper extremity; can perform simple routine tasks (unskilled work) with no fast pace or high production quotas and with infrequent change; with superficial interaction with others (meaning of a short duration for a specific purpose); can perform low stress work meaning no arbitration, negotiation, responsibility for the safety of others or supervisory responsibility.

6. The claimant is unable to perform any past relevant work (2 CFR 404.1565).

7. The claimant was born on ***, 1976 and was 40 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 17, 2016, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 14-25).

## V.  Law and Analysis

### A.  Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into

11

any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. (*Id.*) However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

### B. Plaintiff's Assignment of Error

In the sole assignment of error, Plaintiff asserts that the "ALJ erred in failing to analyze the treating opinion evidence regarding Plaintiff's physical impairments consistent with the regulations, Agency policy, and Six Circuit precedent." (R. 11, PageID# 743). Plaintiff contends that the ALJ violated the treating physician rule with respect to the weight assigned to the opinion of Dr. Sharma. (R. 11, PageID# 745). The Commissioner argues that the evidence supported the ALJ's assessment of the doctor's opinion. (R. 12, PageID# 759).

"Provided that they are based on sufficient medical data, 'the medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference.'" *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002) (quoting *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985)). In other words, "[a]n ALJ must give the opinion of a treating source controlling weight if [the ALJ] finds the opinion

12

'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). If an ALJ does not give a treating source's opinion controlling weight, then the ALJ must give good reasons for doing so that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *See Wilson*, 378 F.3d at 544 (quoting Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *5). The "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is "in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that [her] physician has deemed [her] disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Wilson*, 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)); *see also Johnson v. Comm'r of Soc. Sec.*, 193 F. Supp. 3d 836, 846 (N.D. Ohio 2016) ("The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.") (Polster, J.)

In addition, it is well-established that ALJs may not make medical judgments. *See Meece v. Barnhart*, 192 Fed. App'x 456, 465 (6th Cir. 2006) ("But judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor.") (quoting *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990)). Although an ALJ may not substitute his or her opinions for that of a physician, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 157 (6th

Cir. 2009). If fully explained with appropriate citations to the record, a good reason for discounting a treating physician's opinion is a finding that it is "unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence." *Conner v. Comm'r of Soc. Sec.*, 658 Fed. App'x 248, 253-254 (6th Cir. 2016) (citing *Morr v. Comm'r of Soc. Sec.*, 616 Fed. App'x 210, 211 (6th Cir. 2015)); *see also Keeler v. Comm'r of Soc. Sec.*, 511 Fed. App'x 472, 473 (6th Cir. 2013) (holding that an ALJ properly discounted the subjective evidence contained in a treating physician's opinion because it too heavily relied on the patient's complaints).

> The ALJ in this case addressed Dr. Sharma's medical source statement as follows:
>
> Dr. Sharma completed a treating source statement for the claimant on May 9, 2018. He indicated that the claimant had a diagnosis for lumbosacral spondylosis for which her symptoms included back pain, wrist pain, neck pain, shoulder pain, and radiating pain down both legs. She could sit/stand no more than 30 minutes each at one time for less than two hours in a workday. She could never lift as little as less than 10 pounds, and her symptoms were of sufficient severity that she would likely be off task for approximately 25 percent of the workday. Finally, she was incapable of even low stress work, as stress would worsen her level of pain (15F).
>
> ***
>
> The undersigned affords little weight to the assessment of Dr. Sharma. Notably, it appears based on an evaluation conducted by another treating source, rather than his own examination of the claimant. Additionally, limitations noted appear to coincide directly with the claimant's reported limitations, rather than observed limitations. Further, the level of limitations alleged are not consistent with the overall record. For example, a neurological evaluation conducted shortly prior to the assessment reflected full motor strength in her upper and lower extremities, intact sensation, reflexes, and sensations, and no limitation with toe or tandem walking (16F/81-86).

(Tr. 21, 23).

Unless a treating source's opinion is given controlling weight, the ALJ is required to consider the following factors in deciding the weight to give any medical opinion: the length of the treatment relationship, the frequency of examination, the nature and extent of the treatment

14

relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the source. 20 C.F.R. § 404.1527(c); *see generally Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013); *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). While the ALJ is directed to consider such factors, the ALJ is not required to provide an "exhaustive factor-by-factor analysis" in her decision. *See Francis v. Commissioner*, No. 09-6263, 2011 WL 915719, at *3 (6th Cir. March 16, 2011).

Here, the ALJ's decision acknowledged that Dr. Sharma was a treating provider. The doctor's opinion, however, is contained in a Physical Medical Source Statement—a checkbox questionnaire—that lacks support or explanation. The ALJ took notice of this, stating that the doctor appeared to have filled out the form "based on an evaluation conducted by another treating source, rather than his own examination of the claimant. Additionally, limitations noted appear to coincide directly with the claimant's reported limitations, rather than observed limitations." (Tr. 23). This observation by the ALJ is entirely accurate, as the checkbox form contains a diagnosis of lumbosacral spondylosis and lists symptoms, but provides no response detailing the treatment history, prognosis, or when asked to "identify the clinical findings and objective signs"; and merely states "undergoing treatment" as a description to Plaintiff's "treatment and response including any side effects of medication that may have implications for working…." (Tr. 590-593).[2] The ALJ, in other words, found there was a lack of supportability. Pursuant to the regulations,

---

[2] The inclusion of a diagnosis alone, however, does not save a patently deficient medical source opinion. *See, e.g., Toll v. Commissioner*, No. 1:16CV705, 2017 WL 1017821 at *4 (W.D. Mich. Mar. 16, 2017) ("even if the ALJ failed to provide good reasons" for assigning little weight to a treating source's opinion, such error was harmless where the opinion consisted of a check-box worksheet lacking any explanation beyond a diagnosis).

"[s]upportability" is one of the factors specifically set forth in the regulations used to evaluate opinion evidence, and states that "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. § 404.1527(c)(3).[3]

In addition, the ALJ noted that the level of limitations, which appeared to be Plaintiff's self-reported limitations rather than Dr. Sharma's observed limitations, were not consistent with the overall record. (Tr. 23). Reading the decision as a whole, it is apparent the ALJ considered the overall record when assessing the doctor's opinion. Before specifically addressing the doctor's opinion, the ALJ detailed Plaintiff's testimony and medical history over six single-spaced pages, further assessing pertinent opinion evidence and concluding as follows:

> The claimant experienced limiting signs and symptoms associated with her severe impairments. Imaging of the claimant's lumbar spine showed a transitional L5 body with congenitally narrow L5-S1 interspace (2F/61). An ultrasound of the claimant's left wrist revealed a positive Doppler signal at the carpal bone level (10F/8-9). Results of a catheterization were consistent with native coronary artery disease in

---

[3] Given the complete lack of any meaningful explanation in the doctor's questionnaire, the opinion is arguably patently deficient and not subject to the rigors of the treating physician rule. The Sixth Circuit and numerous district courts have found that failure to give good reasons for rejecting a check-box/checklist opinion, which is unaccompanied by any explanation, is harmless error. *Hernandez v. Commissioner*, 644 Fed. App'x 468, 474 (6th Cir. Mar. 17, 2016) (finding that such evidence was "'weak evidence' at best' and meets our patently deficient standard") (citations omitted); *accord Shepard v. Commissioner*, 705 Fed. App'x 435 (6th Cir. Sept. 26, 2017); *Denham v. Commissioner*, No. 2:15CV2425, 2016 WL 4500713, at *3 (S.D. Ohio Aug. 29, 2016) (magistrate judge "correctly found that any error in the ALJ's consideration of Lewis' evaluation was harmless because the check-box form was so patently deficient that the Commissioner could not possibly credit it"). Because the court finds that the ALJ gave sufficiently good reasons for not adopting Dr. Sharma's opinion, and the Commissioner has not argued that the doctor's opinion is patently deficient, the court declines to expressly address whether the checkbox questionnaire is so patently deficient that a violation of the treating physician rule would be deemed harmless error. However, such a finding would be consistent with the law of the circuit.

16

the right coronary artery, requiring placement of two stents (8F/46-95). Significant physical clinical findings included decreased lumbar range of motion, as well as lumbar, cervical, bilateral sacral joint, and left wrist tenderness to palpation, decreased sensation, and some problems with heel walking (2F/3-6, 2F/32-34, 5F/6-9, 14F/2-6, 16F/81-86). Additionally, the claimant received psychotropic medication management and counseling for psychological signs and symptoms that included a depressed/anxious mood, fidgeting, anxiety attacks, passive suicidal ideation, irritability, memory and nightmares about past traumatic events, and impaired attention/concentration (3F, 9F/2-6, 11F/45-56, 12F/2-6, 14F/2-6).

However, the level of limitation is not consistent with the overall objective findings. There is no evidence the claimant required an assistive device to ambulate, and she was consistently able to toe and tandem walk (2F/3-6, 9F/2-6, 12F/2-6, 16F/81-86). Findings of decreased sensation were not consistent, straight leg raises were negative, and her motor strength, reflexes, and coordination were intact (2F/3-6, 5F/6-9, 9F/2-6, 12F/2-6, 14F/2-6, 16F/81-86). She reported her back pain and mood improved with medication, exhibited no recurrent cardiovascular signs or symptoms after her stent placement, and was noted to make "some progress" in therapy (7F/2-4, 11F/6-10, 11F/38-40, 16F/22-34). In fact, treatment notes reflect findings of a normal mood, affect, concentration, and attention (11F/45-51, 14F/2-6, 16F/22-34, 16F/81-86).

Nonetheless, functional limitations are warranted. To avoid exacerbating her level of pain, she should lift/carry no more than 20 pounds occasionally, stand/walk no more than six hours in an eight-hour workday, and only occasionally climb ramps and stairs. To account for decreased lumbar range of motion, she should no more than occasionally stoop, kneel, crouch, and crawl. To account for her left wrist tenderness, she should no more than frequently handle and finger on the left. Due to the reported effects of her medication, she should never climb ladders, ropes, or scaffolds and should avoid all hazards, such as unprotected heights and hazardous machinery. Due to her depressed mood and concentration/attention limitations, she should perform only simple routine tasks. To avoid exacerbating her anxiety, she should have no fast pace production quotas and should work perform [sic] no more than low stress work in an environment with infrequent change. To account for her reported irritability and tendency to self-isolate, she should have no more than superficial contact with others. For these reasons, the undersigned affords great weight to the assessment of State agency consultants David Knierman, MD, Bruce Goldsmith, PhD, William Bolz, MD and Carl Tischler, PhD, that the claimant could perform the equivalent of unskilled light work with postural and social interaction limitations in an environment with infrequent change and no production quotas. However, given the persistence of her low back and anxiety symptoms, the reported side effects of medication, and clinical findings related to her left wrist, low stress work, frequent left manipulation [sic], and hazard limitations are also warranted.

17

(Tr. 21-22). Moreover, the ALJ's decision specifically highlighted a neurological evaluation that was conducted shortly before Dr. Sharma's assessment. That evaluation reflected Plaintiff had full motor strength in her upper and lower extremities, intact sensation, reflexes, and sensation, and no limitation with toe or tandem walking. (Tr. 23). This inconsistency, coupled with the doctor's lack of explanation supporting his assessment, underpins the ALJ's conclusion to afford little weight to this treating provider's opinion.

Having considered the parties' arguments and governing law, the court finds that the ALJ's discussion encompassed the most pertinent factors—in this case supportability and consistency—and satisfied the treating physician rule. *See generally Crum v. Commissioner*, No. 15-3244, 2016 WL 4578357, at *7 (6th Cir. Sept. 2, 2016) (suffices that ALJ listed inconsistent treatment records elsewhere in the opinion); *Hernandez v. Commissioner*, No. 15-1875, 2016 WL 1055828, at *4 (6th Cir. Mar. 17, 2016). Although the ALJ could have provided a more detailed analysis including each of the regulatory factors, it is apparent that the ALJ considered the proper factors in determining how much weight to ascribe to Dr. Sharma's opinion, as the underlying decision does not need to explicitly discuss each regulatory factor. *See Francis*, 2011 WL 915719, at *3 (the regulations require only consideration of the factors, and does not require an the ALJ to articulate "an exhaustive factor-by-factor analysis"); *Gayheart*, 710 F.3d at 376.

Plaintiff's assignment of error, therefore, is without merit.

## VI. Conclusion

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

IT IS SO ORDERED.

s/ *David A. Ruiz*
David A. Ruiz
United States Magistrate Judge

Date: September 30, 2020